BERGER MONTAGUE PC
Benjamin Galdston (SBN 211114)
Email: bgaldston@bm.net
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Tel:   (619) 489-0300

*Attorneys for Plaintiffs and the Proposed Classes*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| KATHERINE SASS and CODY HOUNANIAN, on Behalf of Themselves and All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> GREAT LAKES EDUCATIONAL LOAN SERVICES, INC., EQUIFAX INFORMATION SERVICES, LLC, TRANS UNION, LLC, EXPERIAN INFORMATION SOLUTIONS, INC. and VANTAGESCORE SOLUTIONS, LLC, <br><br> Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> (I) Violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* <br> (II) Violations of the California Consumer Reporting Agencies Act, Cal. Civ. Code § 1785.14(b) <br> (III) Violations of the California Consumer Reporting Agencies Act, Cal. Civ. Code § 1785.25(a) <br> (IV) Violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* <br><br> **JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ..................................................................................1

II.     THE PARTIES ....................................................................................3

III.     JURISDICTION AND VENUE ...........................................................5

IV.     STATUTORY BACKGROUND—THE CARES ACT .......................5

V.     DEFENDANTS' MISREPORTING AND ITS DEVASTATING CONSEQUENCES ...............................................................................9

VI.     CLASS ALLEGATIONS ...................................................................18

COUNT I
    CAL. CIV. CODE § 1785.25 Against Defendant Great Lakes On Behalf of Plaintiff Hounanian and the California Subclass ..............................20

COUNT II
    15 U.S.C. § 1681e(b) Against Equifax On Behalf of Plaintiffs Sass and Hounanian and the FCRA Class .............................................................21

COUNT III
    CAL. CIV. CODE § 1785.14(b) Against Defendant Equifax On Behalf of Plaintiff Hounanian and the California Subclass ..................................22

COUNT IV
    CAL. BUS. & PROF. CODE § 17200, *et seq.*—Inaccurate Reporting and Scoring Against Defendants Equifax, Trans Union, Experian and Vantage Score Solutions On Behalf of Plaintiff Hounanian and the California Subclass ...................................................................................23

VII.     PRAYER FOR RELIEF .....................................................................25

VIII.     DEMAND FOR JURY TRIAL ...........................................................25

CLASS ACTION COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

Plaintiffs Katherine Sass ("Sass") and Cody Hounanian ("Hounanian") (collectively, "Plaintiffs"), by and through their attorneys, on behalf of themselves and the Classes set forth below, bring the following Class Action Complaint against Defendants Great Lakes Educational Loan Services, Inc. ("Great Lakes"), Equifax Information Services, LLC ("Equifax"), Trans Union LLC ("Trans Union"), Experian Information Solutions, Inc. ("Experian") and VantageScore Solutions, LLC ("Vantage") (collectively, "Defendants").  Plaintiffs' allegations are based upon information and belief and the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## I.  **INTRODUCTION**

1.  Defendants, who are among the nation's largest financial institutions, are compounding the financial distress and other harms already being suffered by Plaintiffs and other student borrowers in connection with the COVID-19 global pandemic.  Great Lakes, together with its parent Nelnet, Inc., services approximately $400 billion—*or nearly 50%*—of all student loans in the United States.  Equifax, Experian and Trans Union are household names and the leading personal credit reporting agencies, and Vantage is their joint venture that operates a shared proprietary consumer credit-scoring model.

2.  As alleged in greater detail below, these Defendants have mishandled desperately-needed federal relief granted to students under the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116–136, ___ Stat. ___ (2020) (the "CARES Act"), by, among other things, inaccurately reporting information about student loan payments that were suspended under the CARES Act. As a result, Plaintiffs and other Class members will suffer long lasting credit stigma, including inaccurate and lower credit scores resulting in no, limited or more costly access to credit.

3.     Unquestionably, the entire nation is suffering under the financial strain caused by the COVID-19 pandemic. Given the concurrence of this pandemic and an ongoing student loan crisis, Congress prioritized relief to student loan borrowers in the CARES Act. Specifically, the Act suspends payments, interest accrual, and collections on federal student loans held by the United States Department of Education from March 13, 2020 to September 30, 2020.  Put simply, the Act "hit the pause button" on federal loans to give students—many of whom have limited or no income—time to weather the COVID-19 financial crisis.

4.     This CARES Act relief is afforded automatically to *all* federal student loan borrowers. Such borrowers are *not* required to make any request or to demonstrate any adverse impact related to COVID-19 in order to receive this relief.

5.     Mindful of many Americans' sudden and immediate need for access to credit, Congress also took care to ensure that its unilateral actions would not jeopardize student loan borrowers' credit scores.

6.     To that end, the Act provides clear directives to loan servicers and consumer reporting agencies. Specifically, all federal student loans held by the Department of Education are to be reported as though the borrower had made required payments. The purpose of the Act's directives was to ensure that nothing Congress did would inadvertently negatively impact borrowers' credit.

7.     Despite the Congress's clear directive, despite the ease of compliance, and despite the potentially devastating impact of misreporting borrowers' loan status, Defendants inaccurately reported the status and financial import of millions of borrowers' student loans.

8.     In a May 14, 2020 statement, Great Lakes did not deny that it has bungled reporting for federal student loans, stating only that it does not

-2-

"believe" that its reporting had impacted students' credit scores. As one commentator has pointed out, "***[t]his . . . directly contradicts the experience of many student loan borrowers***."[1]

9.      In truth, Defendants' misconduct has resulted in immediately lower credit scores, and jeopardized student loan borrowers' access to credit at this crucial time and going forward. These and other harms could and should have been avoided had Defendants exercised even a modicum of reasonable care.

10.     Plaintiffs bring this case in order to immediately halt and correct Defendants' unlawful practices and obtain relief on behalf of themselves and millions of other borrowers.

## II.     THE PARTIES

11.     Plaintiff Katherine Sass is an individual person and a resident of San Francisco, California.

12.     Plaintiff Cody Hounanian is an individual person and a resident of Santa Clarita, California.

13.     Defendant Great Lakes Educational Loan Services, Inc. ("Great Lakes") is a Wisconsin corporation with its principal office in Madison, Wisconsin.  Great Lakes services student loans on behalf of the United States government.  Great Lakes is a "furnisher" of information under both the Fair Credit Reporting Act, 15 U.S.C. §1681, *et seq.* "FCRA") and the California Credit Reporting Agencies Act, Cal. Civ. Code §1785.1, *et seq.* ("CCRAA").

---

[1] Forbes Magazine, *Student Loan Servicers Are Dinging Credit Reports for the CARES Act Forbearance*, by Adam S. Minsky, May 19, 2020, available at https://www.forbes.com/sites/adamminsky/2020/05/19/student-loan-servicers-are-dinging-credit-reports-for-the-cares-act-forbearance/#57f1944965fa (last visited May 20, 2020).

CLASS ACTION COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

14. All the loans Defendant Great Lakes services are loans made under part D and/or part B of Title IV of the Higher Education Act of 1965 (20 U.S.C. § 1087(a)(3), *et seq.*, and § 1071, *et seq.*)

15. All loans Defendant Great Lakes services are held by the Department of Education. These loans are referred to herein as "federal student loans held by the Department of Education."

16. Defendant Equifax is a foreign corporation with its principal place of business in Atlanta, Georgia.

17. Defendant TransUnion is a foreign limited liability company with its principal place of business in Chicago, Illinois.

18. Defendant Experian is a California corporation with its principal place of business in Costa Mesa, California.

19. Defendants Equifax, TransUnion and Experian sell credit reports ("consumer reports" in FCRA parlance) to creditors, landlords, employers and others seeking to evaluate consumers for credit, housing, employment, and other purposes contemplated in the FCRA.

20. Defendants Equifax, Trans Union and Experian's credit reports are consumer reports under the FCRA, 15 U.S.C. § 1681a(d), and consumer credit reports under the CCRAA. Cal. Civ. Code § 1785.3(c).

21. Defendants Equifax, Trans Union and Experian each constitute a "consumer reporting agency" as defined by the FCRA and a "consumer credit reporting agency" under the CCRAA. 15 U.S.C. § 1681a(f); Cal. Civ. Code § 1785.3(d).

22. Defendant VantageScore Solutions, LLC is a Delaware Corporation with its headquarters in Connecticut. Defendants Equifax, Trans Union and Experian jointly own Defendant VantageScore Solutions.

CLASS ACTION COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

III.   **JURISDICTION AND VENUE**

23.    This Court has jurisdiction over the federal claims in this action pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claims in this action under 28 U.S.C. § 1367 and under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

24.    Venue is proper in this District as Plaintiff Sass resides in the District and suffered the consequences of Defendant's actions in this District.

IV.   **STATUTORY BACKGROUND—THE CARES ACT**

25.    On March 27, 2020, Congress passed, and President Trump signed into law the CARES Act. *See* Pub. L. No. 116–136, ___ Stat. ___ (2020).

26.    In order to protect vulnerable borrowers and ease the financial burden of COVID-19 on their families, Congress swiftly enacted special protections for borrowers who have student loans held by the Department of Education.

27.    Among these protections was automatic relief from repayment obligations.  Specifically, Section 3513(b) of the CARES Act immediately suspended all payment obligations on loans held by the Department of Education through September 30, 2020.  Section 3513(c) also halted all accrual of interest during that same period.

28.    The CARES Act does not "defer" borrowers' payment obligations. Instead, the Act relieves borrowers from the obligation to pay completely, charging no interest during the specified period and directing the Secretary of Education to "deem each month for which a loan payment was

-5-

CLASS ACTION COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

suspended under this section as if the borrower of the loan had made a payment. . . ."[2]

29.    The functional result of the CARES Act is that the federal government is paying interest on student loan borrowers until September 2020.

30.    The provisions of the CARES Act that pertain to loans held by the Department of Education are significantly different from the provisions of the Act that relate to other kinds of loans, such as federally backed mortgages.

31.    There are three critical differences between the relief afforded to student loan borrowers and the relief afforded to other kinds of borrowers under the Act.

32.    First, relief for student loan borrowers is automatic and applies to all borrowers, regardless of whether the borrower has been affected in any way by COVID-19. While mortgage loan borrowers must *request* relief from mortgage obligations on an individual basis, the cessation of repayment obligations for loans held by the Department of Education is *automatic* and applies to *all* borrowers. *Compare* § 3513 ("The Secretary of Education *shall* suspend all payments . . . .") with § 4022(b)(1) (allowing consumers to make a "*request*" for relief) (emphasis added).

33.    Second, the CARES Act defers mortgage payment obligations for borrowers who request relief, requiring such borrowers to make a single catch-

---

[2] The Act continues ". . . for the purpose of any loan forgiveness program or loan rehabilitation program authorized under part D or B of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087a et seq.; 1071 et seq.) for which the borrower would have otherwise qualified." The loan forgiveness and loan rehabilitation programs under the Higher Education Act ("HEA") to which the CARES Act refers are programs which treat a borrower's obligations as satisfied so long as the borrower meets certain criteria—either income- or employment-related. As relevant to this lawsuit, all programs referred to in the CARES Act treat the borrower's monthly obligations as *satisfied* and *not* as deferred.

CLASS ACTION COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

up payment immediately at the end of the deferral period. For loans held by the Department of Education, on the other hand, there is no "catch-up" payment immediately at the end of the specified period. Rather, student loan borrowers are to be treated as though they made all required payments. *Compare* § 3513(c) ("the Secretary shall deem each month for which a loan payment was suspended under this section as if the borrower of the loan had made a payment . . .") with § 4022(b)(2) (allowing borrowers a *forbearance* period of up to one year, at the conclusion of which all payments are due) (emphasis added).

34.     Third, the CARES Act reduces interest to zero on loans held by the Department of Education during the period when payment obligations are suspended. In other words, interest that would have otherwise accrued (had the borrower continued making payments) no longer accrues on student loans. For mortgages where relief is granted, on the other hand, interest continues to accrue in the same amounts it would have accrued if the borrower made the deferred payments. *Compare* § 3513(b) ("interest *shall not accrue* on a loan…for which payment was suspended for the period of the suspension") with § 4022(b)(3) ("no fees, penalties, or interest *beyond the amounts scheduled or calculat*ed as if the borrower made all contractual payments on time and in full under the terms of the mortgage contract, shall accrue . . . .") (emphasis added).

35.     Congress recognized that unilaterally changing its payment requirements and interest rates for all federal student loans held by the Department of Education could lead to inaccurate credit reporting.

36.     The CARES Act explicitly requires the Secretary of Education to "ensure that, for the purpose of reporting information about the loan to a consumer reporting agency, any payment that has been suspended is treated as if it were a *regularly scheduled payment made by a borrower*." § 3513(d).

37.    Section 3513(d)'s directive that the loans be treated as though the borrower made regularly scheduled payments is consistent with the structure of the Act itself. The CARES Act constitutes the unilateral action of the creditor (the federal government) in releasing the borrower from the obligation to make payment. Moreover, the Act halts the accrual of interest, and does not require that any payments be "made up" in the future.

38.    Under any reasonable reading of the CARES Act, student loan borrowers who do not pay amounts which the government has instructed them not to pay are of course "current" on their obligations. It would be inaccurate to say that borrowers are subject to the "deferral" of those obligations to some point in the future.

39.    The Department of Education recognized the need for servicers like Great Lakes to implement the CARES Act when handling student loan accounts for millions of borrowers, changing its servicing contract to explicitly require Great Lakes to accurately report borrowers' loans as being repaid, not deferred, consistent with the law.  POLITICO, *Education Department seeks to suspend student loan payments by April 10* (April 2, 2020) ("The loan servicers will be required to report suspended payments to credit bureaus as though a borrower had made an one-time payment rather than as a forbearance, which would have carried a different notation on borrowers' credit reports. Under forbearance, monthly loan payments are suspended or reduced but interest continues to accrue.").

40.    The unequivocal purpose of the CARES Act was to eliminate student loan borrowers' payment obligations to free up their financial resources while also protecting their access to credit.

## V.    DEFENDANTS' MISREPORTING AND
## ITS DEVASTATING CONSEQUENCES

41.    Despite the fact that the CARES Act provides immediate and automatic relief for millions of federal student loan borrowers, and despite the explicit (and superfluous, given the nature of the relief afforded in the Act) guidance in the Act requiring student loans to be treated as paid during the time when the federal government is not requiring any payments, Defendants Great Lakes and Equifax misreported the status of millions of federal student loans held by the Department of Education.

42.    Rather than reporting federal student loans held by the Department of Education as though the borrower had made all required payments, as dictated by the terms of the CARES Act, Defendants Great Lakes and Equifax instead reported millions of loans held by the Department of Education as "deferred."

43.    Plaintiffs Sass and Hounanian are borrowers who have federal student loans held by the Department of Education

44.    Plaintiffs Sass and Hounanian were victims of inaccurate reporting as set forth herein.

45.    Plaintiffs Sass and Hounanian are current on all federal student loan payments and were current prior to the imposition of relief on their student loans under the CARES Act.

46.    Defendant Great Lakes reported Plaintiffs Sass and Hounanian's student loans as being "deferred" in both the "terms frequency" and the "comments" field of the information it furnished about Plaintiffs' loans to Equifax and other consumer reporting agencies to whom Great Lakes reports. Great Lakes also reported a deferred payment start date of September 1, 2020.

47.    When Plaintiffs Sass and Hounanian procured their consumer reports from Equifax, including as recently as on May 18, 2020, the reports

-9-

Plaintiffs received stated that Plaintiffs' loans were "deferred" in both the "terms frequency" and the "comments" section of the report. Equifax's report stated that the deferred payment start date for Plaintiffs' student loans was September 1, 2020.

48.    Both Great Lakes' and Equifax's reporting were inaccurate.

49.    Plaintiffs loans were not and are not "deferred."

50.    Plaintiffs do not have a deferred payment start date of September 1, 2020.

51.    By its plain terms, the CARES Act suspends all required payments through September 30, 2020.

52.    Plaintiff Hounanian suffered a diminution in his Vantage 3.0 scores as a result of Defendants' Vantage Score 3.0 model failing to properly account for the fact that the CARES Act provided automatic relief to all borrowers with student loans held by the Department of Education.

53.    Experian, Trans Union, and Equifax jointly developed, operate, and control the algorithm used to determine a given consumer's Vantage Score.

54.    The algorithm used to determine a consumer's Vantage Score has changed over time, resulting in a series of Vantage Scores. The most recent algorithm generates a score referred to as Vantage Score 4.0. The previous score was referred to as Vantage Score 3.0.  Multiple versions of the Vantage scoring algorithms are in use at the same time, i.e. both Vantage Score 3.0 and 4.0 are in use at the present time.

55.    Experian, Trans Union, and Equifax continue to be involved in implementing and developing ongoing Vantage Score models and algorithms.

56.    In order to implement and continue developing and modifying Vantage Score algorithms, Experian, Trans Union, and Equifax share consumer credit information among themselves.

CLASS ACTION COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

57.     In order to implement the Vantage Score algorithm, Experian, Trans Union, and Equifax each abide by agreed upon policies to ensure consistent data sets and a single consistent score.

58.     Experian, Trans Union, and Equifax offer Vantage Scores for free through their websites and also participate in a variety of joint ventures to sell and market Vantage Scores through their wholly owned subsidiary, Vantage.

59.     In simplistic terms, credit scoring models, including the Vantage Score model, are algorithms which generate a numeric score based on data contained in a consumer's credit report. Based on the algorithm's specifications, certain kinds of credit events (payments, account closures, defaulted payments, liens, etc.) can negatively or positively affect a consumer's credit score.

60.     Vantage credit scores are used by financial institutions, creditors, and other users of credit scores to evaluate consumers for credit, housing, insurance, employment, and numerous other purposes.

61.     Defendants Equifax, Experian, Trans Union and Vantage failed to adjust the Vantage Score algorithm to account for relief that was automatically provided to student loan borrowers whose loans are held by the Department of Education.

62.     Rather than treating the suspension of borrowers' payment obligations as a score-neutral (or even score-positive) event, the Vantage Score algorithm used by Equifax, Experian, Trans Union and Vantage treated the relief afforded to student loan borrowers whose loans are held by the Department of Education as a negative event.

63.     The Vantage Score scoring algorithm therefore caused a precipitous, sudden, and predictable drop in the Vantage Scores of student loan borrowers whose loans are held by the Department of Education.

64.     This drop was unjustified. Defendants had zero (literally *none*) factual support for the drop in Vantage Scores. The borrowers whose scores dropped had done nothing differently than they had in the past and, if anything, were in a better financial situation (and presented a better credit risk) than they would have been had the relief afforded by the CARES Act never come to fruition.

65.     As a direct and predictable result of the failure by Defendants Equifax, Experian, Trans Union and Vantage to adjust their scoring model, millions of Americans' Vantage Scores dropped as soon as the credit reporting agencies began to report borrowers' loans as having received CARES Act relief.

66.     Had the Vantage scoring model been properly adjusted to account for the CARES Act, the model would have ensured that borrowers with loans held by the Department of Education either experienced no change in their scores as a result of the CARES Act or experienced an increase in their scores.

67.     Plaintiff Hounanian's score dropped by nearly 33 points when calculated based on Equifax's data, and by 27 points when calculated using Trans Union's data.

68.     As a result of his score dropping for no justifiable reason, and because he did not want to obtain mortgage pre-approval that would be impacted by a falsely diminished credit score, Plaintiff Hounanian was forced to abandon his search to purchase a new home.

69.     Plaintiff Hounanian has already signed a lease to rent his current home to new tenants beginning in June 2020.

70.     Plaintiff Hounanian incurred out of pocket losses as a result of his not being able to pursue the purchase of a new property.

71.     Plaintiff Hounanian was forced to purchase storage space in order to move his personal effects out of the home he currently owns so that the

-12-

home will be ready for tenants to move into in June. He will incur additional out of pocket expenses as a result of not being able to move directly from his current home to his new home, as he will be forced to reside elsewhere in the meantime.

72.   Comenity Bank accessed Plaintiff Hounanian's Equifax credit report while Equifax was reporting inaccurate information about the status of Hounanian's student loan.

73.   In the realm of consumer debt and consumer reporting, a "deferred" notation is a scarlet letter. Deferred payment arrangements imply that the borrower is unable to meet the terms of the loan as originally agreed, has requested that payments be deferred to a time in the future, and that the borrower, as a result, has a diminished present capacity to make payments and will face those deferred obligations on an ongoing basis in the future.

74.   The impact of Defendant Equifax's and Great Lakes' reporting of millions of student loans as "deferred" instead of reporting the loans as paid on time, was immediate, sweeping, and devastating.

75.   For loans serviced by Defendant Great Lakes, borrowers' credit scores dropped immediately and significantly.

76.   The consumer reporting agencies' automated Vantage Score credit scoring systems treat deferred loans as derogatory items that negatively impact the consumers' creditworthiness.

77.   Defendants' illegal conduct was willful and reckless.

78.   The CARES Act was well publicized and compliance with the Act's provisions is straightforward.

79.   Even cursory attention to the information they reported on millions of borrowers should have alerted Defendants to the gross and sweeping nature of their misreporting, and to the devastating and predictable impact their erroneous reporting would have.

80.     Rather than implementing reasonable procedures to ensure that they would not compound the financial impact of COVID-19 on millions of Americans, Defendants instead continued with business as usual, relying on antiquated systems and automated processes which completely failed to account for the changes made by the CARES Act.

81.     Defendants had a myriad of existing options available to them that would have allowed them to report borrowers' loans in a fashion that complied with the dictates of the CARES Act and that would have preserved borrowers' credit scores.

82.     Defendants could have easily reported accurately using existing tools and procedures. Yet, Defendants failed to do so.

83.     Borrowers noticed and sought relief from Defendants' inaccurate reporting immediately.

84.     Defendant Great Lakes' Twitter feed, staffed by an employee who goes by the nickname "Missy" and who tweets using the Twitter handle @MyGreatLakes, has seen numerous complaints about the impact of Defendants' credit reporting.

85.     Defendant Great Lakes acknowledged the inaccuracy of its reporting, and apologized, but refused to fix the problem until the end of the month:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Cody "Coderan 'Hakeem "The Stream" Olajuwon'" Chri @.. · May 13**
Why did you fuck up everyone's credit score and will you forget about my loans?

♡ 1

**Great Lakes**
@MyGreatLakes

Replying to @StreamedHams

I do apologize for all the frustration. We will be changing the way we report the Covid 19 forbearance to the credit bureaus. This will begin with our regular May month end reporting and will retroactively change the reporting for April . Missy

12:12 PM · May 13, 2020 · Sprout Social

**Cody "Coderan 'Hakeem "The Stream" Olajuwon'" Chri @.. · May 13**
Replying to @MyGreatLakes
And that helps the credit check I'm getting now how? But if I missed a payment by a few days you'd be up my ass. I'm sorry social person but your company fucked up too big for we do apologize for the inconvenience. How about 20% reduction in loans? I can wait for class action too

♡ 1                                                          ♡ 1

**Great Lakes** @MyGreatLakes · May 13
This may have led to credit score changes. It will also mean we report accounts as current and in repayment going forward. We do apologize for all the inconvenience this may have caused. Unfortunately can not give out a reduction of your loans. Missy

♡ 1

**Cody "Coderan 'Hakeem "The Stream" Olajuwon'" Chri @.. · May 13**
Ok how much you think they're gonna have to settle for when sued?

♡ 1

**Great Lakes** @MyGreatLakes · May 13
I do apologize. We are working as fast as we can to get this updated. Missy

-15-

CLASS ACTION COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

86. Defendant Equifax was or should have been aware of the inaccuracy of the information furnished by Great Lakes.

87. Equifax never should have parroted Great Lakes' inaccurate information.

88. Had Equifax performed even a cursory review of the April credit reporting file it received from Defendant Great Lakes, a loan servicer that only services federal loans held by the Department of Education, Equifax would have realized that Great Lakes reporting was inaccurate.

89. The inaccuracies in Great Lakes reporting were apparent on their face. Great Lakes suddenly reported millions of borrowers as having deferments, and also reported all those deferrals as having a deferred payment start date of September 1, 2020.

90. Equifax knew or should have known that Great Lakes was mischaracterizing the relief under the CARES Act as a deferral and misreporting the date of a non-existent deferred payment start date.

91. Equifax failed to take appropriate steps to ensure that Great Lakes appropriately reported the CARES Act's legally mandated payment suspensions.

92. Adding insult to injury, Equifax not only misreported the status of borrowers' loans, it participated in incorporating that misreporting into the Vantage Score. Numerous consumers' Vantage Scores dropped immediately, and significantly, as soon as Defendant Equifax incorporated Defendant Great Lakes' inaccurate April reporting into its credit reporting database.

93. This sudden drop in such a large number of scores should have also alerted Equifax to its reporting errors. Yet, this clear signifier of erroneous reporting on a massive scale garnered no correction to Equifax's reporting.

94. In a belated effort to ameliorate the perverse impact of its conduct, Defendant Vantage subsequently announced that it would "adjust" its

algorithms to minimize the negative impact associated uniquely with the usage of "deferment" codes in consumer reports.[3]

95.     However, this announced change fails to adequately address the problem for student borrowers for at least two reasons: First, federal student borrowers' loans are not in deferment. The CARES Act is unequivocal that borrowers are current on their obligations. So, coding the loans as "deferred" is inaccurate and harmful.  Adjusting a scoring model to not punish borrowers whose loans are inaccurately reported is an inappropriate solution to the problem that Defendants collectively created.

96.     And second, there is *zero* (literally *none at all*) support for *any* adverse consequent to federal student loan borrowers credit scores as a result of the federal government unilaterally suspending their loan payments. If anything, federal student loan borrowers' credit scores should *improve* relative to other consumers' scores as a result of the CARES Act because the Act frees up student loan borrowers' resources to allow them to more easily incur and honor new credit obligations.

97.     Defendant Vantage's announcement that it will "minimize" the impact on borrowers' scores is insufficient. The impact on borrowers' scores should be *eliminated*.

98.     Defendants' actions have turned the relief afforded to student loan borrowers on its head. Instead of improving borrowers' financial status and improving their ability to acquire additional credit, Defendants' conduct has operated to borrowers' detriment.

99.     Defendants' conduct violated the law in three primary ways.

---

[3] https://your.vantagescore.com/resource/439/faq-vantagescore-credit-scores-and-covid-19-pandemic (last visited May 20, 2020).

100.   First, Defendant Great Lakes violated the FCRA and the CCRAA by furnishing inaccurate information about consumers to consumer reporting agencies.  *See* 15 U.S.C. § 1681s-2(1)(A), Cal. Civ. Code § 1785.25(a).  The information Great Lakes furnished inaccurately characterized Plaintiffs' and Class members' loans as being "deferred" and provided a non-existent deferred payment start date.

101.   Second, Defendant Equifax violated the FCRA and the CCRAA by failing to employ reasonable procedures to ensure maximum possible accuracy.  *See* 15 U.S.C. § 1681e(b), Cal. Civ. Code § 1785.14(b).  Had Equifax properly reviewed the information Great Lakes furnished to it, Equifax would have realized the information was inaccurate.

102.   Third, Defendants Equifax, Experian, Trans Union and Vantage violated California's Unfair Competition Law ("UCL") by reducing consumers' Vantage Scores as a result of consumers being included in the loan suspension program created by the CARES Act. Given the automatic nature of the relief afforded by the Act, Defendants had no basis for a wholesale reduction in consumers' scores. Reducing scores in this fashion contravenes the public policy behind the CARES Act and is unfair because it penalizes borrowers for no reason other than that Defendants failed to anticipate the impact that data would predictably have on consumer' credit scores, and failed to revise their scoring algorithms in light of the relief provided by the Act.

## VI.   <u>CLASS ALLEGATIONS</u>

103.   Plaintiffs asserts claims on behalf of themselves and the two Classes, as defined below:

> **The FCRA Class:**
>
> All residents of the United States about whom Great Lakes furnished credit information to Equifax or any other

consumer reporting agency[4] pertaining to the April 2020 status of loans serviced by Great Lakes.

**The California Subclass**

All members of the FCRA Class who reside in California.

104.   This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

105.   <u>Numerosity</u>:   The Classes are so numerous that joinder of all Class members is impracticable. Defendants report information on consumers nationwide and have produced thousands of reports on consumers in California.

106.   <u>Typicality</u>: Plaintiffs' claims are typical of other Class members' claims. Defendants treated Plaintiffs in the same manner as other Class members.

107.   <u>Adequacy</u>:   Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel experienced in complex class action litigation.

108.   <u>Commonality</u>: Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. These common questions include:

a.      Whether Defendants violated the FCRA and CCRAA by failing to follow reasonable procedures to assure maximum possible accuracy;

b.      Whether any such violations were willful; and

c.      Whether Defendants violated the UCL;

d.      The proper measure of damages; and

e.      The proper form of injunctive relief.

---

[4] Including but not limited to Experian, Trans Union or LexisNexis.

109.   Class certification is appropriate under Fed. Civ. P. 23(b)(2) and 23(b)(3). because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the FCRA and rendering final injunctive and declaratory relief appropriate respecting the Classes as a whole. Members of the Classes do not have an interest in pursuing separate actions against Defendants, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I

**Cal. Civ. Code § 1785.25**
**Against Defendant Great Lakes On Behalf**
**of Plaintiff Hounanian and the California Subclass**

110.   The CCRAA forbids Defendant Great Lakes from furnishing information on a transaction or experience to any consumer credit reporting agency if the person knows or has reason to know the information is incomplete or inaccurate. Cal. Civ. Code § 1785.25(a).

111.   Defendant Great Lakes violated this provision by furnishing inaccurate information stating Plaintiff Hounanian's and the California Subclass members' federal student loans were "deferred."

112.   Because of information furnished by Defendant Great Lakes,

-20-

Plaintiff Hounanian's and members of the California Subclass's credit reports are more derogatory than they would have been if they were accurate.

113.   Because Plaintiff Hounanian and the members of the California Subclass are experiencing an unprecedented pandemic and related financial crisis, they have an ongoing need to be able to access credit on demand. There is therefore a real and immediate threat that Plaintiffs will suffer the same injury with respect to inaccurate future reporting.

114.   Accordingly, Plaintiff Hounanian and the California Subclass are entitled to injunctive relief and to the recovery of attorneys' fees and costs.

## COUNT II

**15 U.S.C. § 1681e(b)**
**Against Equifax On Behalf of Plaintiffs Sass**
**and Hounanian and the FCRA Class**

115.   Equifax failed to comply with 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the records it reported.

116.   The foregoing violations were negligent.

117.   The foregoing violations were willful.

118.   Equifax acted in negligent, deliberate and reckless disregard of its obligations and the rights of Plaintiffs and Class members under 15 U.S.C. § 1681e(b). Equifax's negligent and willful conduct is reflected by, *inter alia*, the following:

     a.  Equifax inaccurately described the status of Plaintiffs' and other Class members' federal student loans as "deferred."

     b.  The plain terms of the CARES Act make clear that Plaintiffs' and other Class members' loans were not "deferred";

     c.  Equifax has received complaints from consumers indicating that its reporting is inaccurate;

CLASS ACTION COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND

d. Equifax easily could have prevented inaccurate reports by reviewing and vetting information it received from Great Lakes, but failed to do so;

e. After learning about inaccurate information furnished by Great Lakes, Equifax continued to include inaccurate information in its reports rather than suppressing Great Lakes' tradelines;

f. Defendant Equifax's conduct is directly contrary to the plain language of the CARES Act as well as its legislative intent; and

g. By adopting a policy of failing to review information from its furnisher, and of failure to retract such information, Equifax voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

119.   Plaintiffs and the FCRA Class are each entitled to actual damages or statutory damages of not less than $100 and not more than $1,000 for this violation. Plaintiffs and the FCRA Class are each also entitled to punitive damages and to recover costs and attorneys' fees.

## COUNT III

### CAL. CIV. CODE § 1785.14(b)
### Against Defendant Equifax On Behalf of
### Plaintiff Hounanian and the California Subclass

120.   Equifax is a consumer credit reporting agency as defined by the CCRAA. Equifax is required to adhere to all CCRAA requirements.

121.   The CCRAA required Equifax to follow reasonable procedures to assure maximum possible accuracy of the information it reported. Cal. Civ. Code § 1785.14(b).

122.   Equifax violated this provision by failing to establish or to follow

-22-

reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report it furnished regarding Plaintiff Hounanian and other California Subclass members.

123.   Specifically, Equifax inaccurately reported Plaintiff Hounanian's and other California Subclass members' federal student loans as "deferred" and as having a deferred payment start date of September 1, 2020.

124.   Because of Equifax's inaccurate reporting, Plaintiff Hounanian's and other California Subclass members' credit reports are more derogatory than they would have been if they were accurate.

125.   Because Plaintiff Hounanian and the California Subclass are experiencing an unprecedented pandemic and related financial crisis, they have an ongoing need to be able to access credit on demand. There is therefore a real and immediate threat that Plaintiffs will suffer the same injury with respect to inaccurate future reporting.

126.   Accordingly, Plaintiff Hounanian and other California Subclass members are entitled to injunctive relief and to the recovery of attorneys' fees and costs.

## COUNT IV

**CAL. BUS. & PROF. CODE § 17200, e***t seq.*
**Inaccurate Reporting and Scoring**
**Against Defendants Equifax, Trans Union, Experian and Vantage**
**On Behalf of Plaintiff Hounanian and the California Subclass**

127.   By reporting inaccurate credit information regarding Plaintiff Hounanian and the California Subclass, Defendants diminished Plaintiffs' credit scores and deprived them of credit opportunities.

128.   Defendant Equifax's inaccurate reporting constituted an unlawful, unfair, and fraudulent business practices.

129.   Defendant Equifax's practices were unlawful because they violate the FCRA, the CCRAA and the CARES Act.

-23-

130. Both the FCRA and the CCRAA requited Equifax to follow reasonable procedure to assure maximum possible accuracy of the information it reported. As described above, Defendant violated these provisions.

131. Defendant Equifax also violated the CARES Act and its associated policies by reporting loans as deferred, when in fact the loans were to be reported as though the borrower had made required monthly payments.

132. Equifax's practices were also unfair, because it is unethical, immoral, unscrupulous, oppressive, and substantially injurious to consumers to report information about the status of their loans which is false.

133. Defendants Equifax, Experian, Trans Union and VantageScore Solutions' practices were also unfair because it is unethical, immoral, unscrupulous, oppressive, and substantially injurious for Equifax, Experian, Trans Union and VantageScore Solutions to create, use, market, sell, and promote a credit scoring model which inaccurately predicts that consumers are worse credit risks based on nothing other than the fact that they have federal loans as to which the federal government has suspended payment requirements. Such a prediction has no basis in fact and runs directly counter to public policy as stated in the CARES Act.

134. Defendant Equifax's practices were fraudulent because the report recipients were deceived and/or were likely to be deceived by Defendant Equifax's inaccurate representations with respect to Plaintiffs and the California Subclass Members' loans and creditworthiness.

135. Defendants Equifax, Experian, Trans Union and VantageScore Solutions' practices were also fraudulent because consumers and report recipients were deceived and/or were likely to be deceived by Defendants' inaccurate representations with respect to Plaintiffs and the California Subclass Members' creditworthiness.

136.    The harm caused by these business practices vastly outweighs any legitimate utility they possible could have.

137.    Because Plaintiff Hounanian will seek credit in the future, and because of the ubiquity of Defendants' reports in credit screening, there is a real and immediate threat Plaintiff Hounanian will suffer the same injury with respect to future credit applications.

138.    Plaintiff Hounanian and the California Subclass are entitled to injunctive relief and to the recovery of attorneys' fees and costs.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Classes, pray for relief as follows:

     a.  Determining that this action may proceed as a class action;

     b.  Designating Plaintiffs as class representatives and designating Plaintiffs' counsel as counsel for the Classes;

     c.  Issuing proper notice to the Classes at Defendants' expense;

     d.  Declaring that Defendants violated the FCRA, CCRAA and UCL;

     e.  Declaring that Defendants acted willfully, in knowing or reckless disregard of Plaintiffs' rights and Defendants' obligations under the law;

     f.  Awarding actual, statutory and punitive damages as provided by the FCRA, CCRAA and UCL;

     g.  Awarding appropriate injunctive and equitable relief;

     h.  Awarding reasonable attorneys' fees and costs; and

     i.  Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

## VIII.    DEMAND FOR JURY TRIAL

Plaintiff and the Classes demand a trial by jury.

Dated:  May 20, 2020

Respectfully submitted,

BERGER MONTAGUE PC

*/s/ Benjamin Galdston*
Benjamin Galdston (SBN 211114)
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Tel:  (619) 489-0300
Email:  bgaldston@bm.net

-and-

E. Michelle Drake*
John G. Albanese*
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel.:  (612) 594-5999
Fax:  (612) 584-4470
Email: emdrake@bm.net
        jalbanese@bm.net
*pro hac vice* forthcoming

Alexander Hood*
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Tel: (720) 239-2606
Email: alex@towardsjustice.org
*pro hac vice* forthcoming

*Attorneys for Plaintiffs and the proposed Classes*

CLASS ACTION COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND